It's an honor to serve with you, Peace Corps. Immigration Resolution    So I turned to Michael who was working on the loan. It was almost a cracker. He said he would kill me if I gave him money. He said if the money was not transferred to his account, the federal debt would suffer because of it and  It was just like the credit fund being surreal. But bribery only was fun. All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and its honorable court. Please be seated. Good morning. The first case for argument this morning is 16-2276, Love Terminal v. United States. Mr. Lundman, whenever you're ready. Good morning and may it please the court. Robert Lundman representing the United States. I plan to reserve four minutes for rebuttal. The Court of Federal Claims here made a fundamental legal error in its analysis of the Right Amendment Reform Act. That act did not mandate demolition of the Lemon Avenue Terminal, nor did it bar plaintiffs from using that terminal for air and transportation purposes. All three of plaintiff's takings theories are based on this error and this misread of the act. To understand the Reform Act, though, you have to start with the Right Amendment. And the Right Amendment was enacted in 1980. It restricted flights to and from Love Field, the airport located in the city of Dallas. The flights could only travel to and from Love Field within Texas into four states bordering Texas. And there was an exception for planes with 56 or fewer seats. Can I just interrupt you just because we all know the background. So let me just get to the heart of it. And this is just a general question. I'm not talking about the demolition here. I'm just talking about the Lemon Avenue Terminal. And in the, do we call it ORRA? ORRA or the Reform Act, either way I think it's the same. It did incorporate a section of the Five-Party Agreement that allocates stuff that says you shall abide by the contractual rights and duties you have. And if you look at what those rights and duties are, I don't know if I'm wrong, but I think you can see that at some point in the agreement that that statute incorporated the agreement which already allocated all of the 20 gates to certain airlines, which would have excluded the Lemon Terminal. I don't think the statute incorporated the Five-Party Agreement across the board. Exactly. I'm not suggesting that. I'm talking about that portion of the Five-Party Agreement that said Southwest is going to get four gates and so-and-so is going to get five gates. It seems to me if we're, if the statute encompasses those contractual obligations, then the gates that are available under ORRA, which is a total of 20, are already allocated under the statute. The statute does not allocate the gates. The statute sets a cap of 20, and that's right in the language of five people. It has a responsibility for allocating gates. Dallas had a responsibility to allocate the gates. But does not the statute reference that we're incorporating or whatever, that they have to abide by their contractual rights and duties? And aren't the rights and duties specifically referred to in the statute? Doesn't that include the rights and duties,  the allocation of those gates as they're allocated in the leases that are in existence? So the statutory language, the City of Dallas pursuant to its authority to operate and regulate the airport as granted under Texas law and the Act, and Texas law is a summary of the statute that's stated there, shall determine the allocation of leased gates at Managed Love Field in accordance with contractual rights and obligations existing as the effective date of this Act for certificate air carriers providing scheduled passenger service at Love Field on July 11, 2006. That's 5A. It's not a specific reference to the five-party agreement. If you want a specific reference to the five-party agreement, there is one in 5D. It refers specifically to the agreement, but doesn't refer to the gate allocation provisions. But don't contract backups of what were the contractual rights and obligations existing with regard to the allocation of leased gates? So there's a whole suite of... Were there contractual rights and obligations existing? There were. Dallas had... That's data point one. Yep. And so where would you find those contractual obligations? What contract? There were contractual obligations between Dallas and the lessors of the airport. So that included... And what were those obligations? That's the contract between Dallas and the four or five airlines? Well, that agreement... I'm trying to get you to tell us what document contains the rights concerning the allocation of leased gates. There's no single document. This is a statement saying... The best reading of this is Dallas, you have contractual obligations. The federal government in the Reform Act is not trumping or rewriting or getting Dallas off the hook. I think you're missing the point. The question is, put aside the 2006 statute. I think what Judge Clevenger is asking about is what was Dallas's obligation with respect to the lessees concerning the allocation of gates. Could... Under the contract with the lessees and under the lease, could Dallas not allocate gates to them? The contract... The Love Terminal Partners contract with Dallas? Yeah. That contract provided for the plaintiffs to have gates at that facility. And the... What exactly did it say about that? It said that there was a contract between Dallas  Dallas. Well, it said they had to pay so much rent and it said they had a... I don't have all the provisions at my hand, but it said a rent and provided for a lease of various property. I don't know... I don't think it specified either the sublease or the master lease, the number of gates there. It provided for a lease of Dallas property. So each of the contracts that Dallas had with respect to the other terminal and other gates and the airlines there, both provided them with a right to a certain number of gates, but also provided for entrance. And so I think that if a new airline wanted to use gates at the airport, they could come to the new entrant, if it was a new... So I guess the point I think from these contracts is it's not a fixed universe of folks who can use Love Field. It's a potentially... It's confusing to talk about the contracts. The leases. The leases, which is the property that's claimed here. Right. They did not specify any gate information with respect to the... What about appendix 3091? Or actually it's on 3089. This is a contract, and it deals with joint statement between the parties regarding right amendment issues. And on page two of that, it's article two, three B. And it says Southwest should have preferential use of 15 gates under its lease. American Airlines shall have preferential use of three gates, and somebody else is going to get two gates, which gives you the 20 gates, which is all that's allowed. How is... Isn't this allocation really what is meant by the statutory provision, which kind of mandates that they're going to do whatever in accordance with these contractual rights? That's all I'm saying. That may not resolve the case. I'm not saying it resolves the case, but I don't think that's what it does, because let me try to explain why really quickly. The statute doesn't refer, in 5A, the provision you're talking about, doesn't refer just to this contract. The United States is not a party to this contract. This contract, you're right, between Dallas, Southwest, and the other airlines, allocates the gates and answers the question of where the gates should be for  It doesn't answer it for the United States, and the United States in the Reform Act doesn't answer it either. It says there's going to be 20 gates, and you, Dallas, need to sort that out, taking into account your contractual obligations, not just this provision. And we know we're not talking just to this contract, because in 5A, it refers to When the statutory language commands, demands, that Dallas shall manage the love field in accordance with the contractual rights and obligations existing as of the effective date, doesn't that therefore in the statute incorporate a congressional mandate that this is what Dallas has to do with respect to the gates? Well, it doesn't, I don't think so, because the Reform Act knows how to reference, and Congress knew how to reference this specific agreement, and it does it in the same section in 5D. It says the five-party agreement and there's a specific reference to it. This is much broader. It's a reference to contractual rights and obligations for Dallas. Isn't your better argument that maybe it does and maybe it doesn't, but where you're talking about the intent of Congress to clearly incorporate a contract into its statute, it requires certainty, not possibility. That's exactly right. I mean, I don't know why you're fighting it so hard. I mean, the short of the matter is that one reasonably might read 5A in the statute where it says shall determine the allocation pursuant to some contract, and then you look around and you say, well, is there a contract extent that allocates gate? Yep. Which one is it? And it's the document that the Chief Judge is reading. It's this one, and even that provision, though, I guess one more point. Can the government point to any other contractual obligation existing as of July 11, 2006 that involved the City of Dallas and the allocation of the gate? Is there any other contract? Yes, even this contract talks about the leases the City of Dallas has with airlines concerning the number of gates. So this contract makes clear there are other  rights. It talks about existing lease to be used for passengers. It references the Southwest lease. Are you in B? I'm in 3B on page 3091. Second line, American Airlines and Southwest agreed to voluntarily surrender eight gate rights under existing leases. So that's the first reference to other contractual rights concerning this airline, this airfield. And if you keep going down, there's more of them, existing leases. Each of the airlines mentioned here has a lease with the City of Dallas that concerns the number of gates. Is that inconsistent with B, the number of gates they have? I don't know what the answer is with respect to whether they had to give up gates or not. I think the answer is they did have to reduce the gates because they had... Then this contract overrode the earlier contracts. Right. And this is the only contract then that applies to the allocation of gates. Well, I mean, it overrides parts of it, but you have to read every single contract. I think the bigger... I'm confused. I'm confused. Look, I did not understand that the takings theory here was that the 2006 statute changed the gate allocation. I thought that the theory was that there was a reasonable expectation that the right amendment would be repealed and that the failure to repeal the right amendment was in the reaffirmation of the right amendment for a period of years in the 2006 statute was a taking and also that there was a physical taking of the terminal. Was part of the theory here that the change in the gate allocation, the alleged change in the gate allocation itself constituted a taking? I think that may be part of the theory but I think their main theory is physical taking and that they could not develop a terminal free of the right amendment and that's what their just compensation award of $133 million is based on, a terminal free of the restrictions of the right amendment and the right amendment enacted in 1980 and they can't have that expectation. The other aspect of this five party contract, even if you read it, is incorporated in the 2006 legislation, simply says that Dallas will acquire the terminal by negotiation or condemnation. How can it be that a direction, a federal direction to acquire something by negotiation, let's take that first, is a taking? That would not be a taking and that demolition language is not referencing the reform act. It's not as though the statute or even the agreement says go out and demolish these things, it says negotiate with them to acquire the lease. Acquire the lease and get the gates down to 20 and it mentions that. By negotiation. Right. And if that doesn't work, you do it by condemnation. And what happens is just after the reform act, Love Terminal stopped paying rent, at that point Dallas moved to condemn the terminal and the court granted them possession of it and that was it. And then they destroyed it after they were granted possession and after Love Terminal stopped paying rent. So would it be a taking if the federal government said, well you have a right to these gates under your lease, let's assume the lease said you have the right to use six gates, let's say, and the federal government says no, no, you can't use those gates anymore. Would that be a taking? Then we'd be in the regulatory taking world, we'd have to examine their expectations, here this was a highly regulated industry, they made a highly regulated particular airport, you have to look at the economic effect and the character of the governmental action, we've run through all those in our brief and I think the take away here is even if the act was more targeted than it is, it would not be a taking under those factors. I see I'm well into my rebuttal time, do you have more questions now? I thought that your adversary's physical taking claim was based on a theory that the Lemon Avenue facility which they leased the property but presumably they paid some money to build this thing, that Uncle Sam put a bulldozer to it, is their theory that their theory is the United States mandated the bulldozers in the reform act to demolish and there's just no demolition section of the reform act. There's no demolition section to the five party agreement either, it doesn't say go bulldoze the thing, it says negotiate with them. I think that's right and there's a provision about removal of gates, I'm sure they'll argue about that, but that's all in the five party agreement, the United States is not a party to it, and the reform act does not incorporate the whole thing, and it doesn't incorporate those specific parts. Right, and it mentions the removal of the gates of the Lemon Avenue terminal. Again, that's the five parties deal, that's not the United States' deal, it's not mandated by the reform act, and the United States just can't be liable for $133 million when it doesn't direct the city of Dallas to do the thing the city of Dallas decided to do. Well, as you pointed out originally, if you take out the incorporation of the contract, the entire case falls. I think that's right, and it doesn't incorporate the whole contract, it selectively enacts federal law provisions, some of which parallel the contract, but not the language you mentioned about potential removal and up to including condemnation or demolition, it doesn't specifically reference and incorporate the language in the agreement talking about the plaintiff's case. So the United States' role here was one that reformed and relaxed the right amendment restrictions, loosened them, but did not mandate and target plaintiff's property and leases. May it please the court, Roger Marzullo appearing on behalf of Love Terminal Partners in Virginia Aerospace. The trial court correctly found that a Lucas-type categorical taking had occurred in this case. Go back for one moment to the things we've been talking about earlier. Is part of your theory that the government in the 2006 legislation took away the gates that your client was otherwise entitled to under the leases? That was part of the statutory requirement, Your Honor. Section 5A of the Reform Act requires that Dallas reduce from 32 to 20 the number of gates at Love Field. And that was your client. Did your client have a right under its agreements with the City of Dallas to allow the conduct of air transportation services? So it actually had been an airline lease originally. It did not speak to the number of gates that were allowable under the terminal agreement more or less. Well then how could it be a taking to change the number of gates or to take away the gates? The taking, Your Honor, was the determination, the requirement, first of all, under 5A, that Dallas manage Love Field in accordance with the five-party contract, the contract of July 11, 2006. Section 5D speaks to the removal of gates at the Lemon Avenue facility. Lemon Avenue is where Love Terminal was located. The removal of gates at the Lemon Avenue facility, Love Field, quote, as required by this act. But if you didn't have a right to have the gates there in the first place, how could the direction to take away the gates be a taking? No, no. The gates were allowable. The terminal had been constructed, Your Honor, and was existing, and had been used over time as an airline terminal. It was a second airline terminal being used at Love Field. It was allowable, but there was nothing in the property. The right to construct a terminal, to operate that terminal, was part of the property right. Now, the overall master plan, the Love Field master plan that was being redeveloped, that was the subject of the five-party agreement of July 11, 2006. It required demolition of the partners' terminal, and construction of a 20-gate terminal at the location that the main terminal is actually existing now. And we know, as a matter of fact, from the City of Dallas, that the case of City of Dallas versus Delta Airlines, the Fifth Circuit decided recently, that those two  would cost $519 million apiece. We know from the record that the new terminal cost $519 million. Now, what was the federal involvement? The government keeps saying why Dallas could have done this on their own. Well, they couldn't because of the Antitrust Act, because of federal preemption of air transportation in this country. In order to proceed with the  of Love Field, which has now taken place, the City of Dallas was required to get FAA approval. So what does Section  It says there is no action that is inconsistent with the July 11, 2006, Five-Party Agreement. It specifically calls out the Five-Party Agreement. So if you take all these sections together, all the sections of Section 5, and you take the factual circumstance that Congress had asked the local government to do, and you propose that to Congress, they did get together, they signed a Five-Party Agreement, they said here is our local solution. We're going to take out 12 gates. Well, where were those gates going to come from? Kennedy Put aside the question of whether your client had a right to gates, which you seem to agree they didn't. All the Five-Party Agreement says is that they had the absolute right to construct a terminal, a terminal containing gates. What I said is that the lease did not Oh, certainly, Your Honor. Kennedy Put aside the gate question. Your theory is that Section 5 of this 2006 statute. But all that says is that Dallas is going to negotiate with your clients to acquire the lease and, if necessary, to do it by condemnation. Let's take the first part of that. If the federal government says to Dallas, please negotiate with these people to acquire a lease, that's not a taking, right? Well, I'm not sure the word negotiate, Your Honor, is in that agreement. I believe the word is acquire, that the city of Dallas shall acquire the lease up to and including condemnation and shall demolish the gates as soon as practicable so that they may never again be used. Wait, how can it be a taking to tell somebody to acquire something? I don't understand that. That doesn't say acquire without compensation or acquire involuntarily. I mean, it just says acquire. Yes, so I would focus on the language requiring demolition of the gates so that they may never again be used for air passenger service. Dallas was not a place to negotiate with your client to acquire the gates. That wouldn't be a taking, right? Well, no, it doesn't sound like because shall negotiate doesn't mean that my client has to agree to anything. Okay, and directing them to adopt a resolution of condemnation. How did they value the property? They valued it at zero. Why? Because air transportation service was no longer an allowable use on that property. So, in point of fact, as part of the overall redevelopment of Love Field, the gates had to be reduced to 20. That's explicit in Section 5A. The Love Field had  managed. Your client was in arrears on the lease, right? No, Your Honor. Absolutely not. My client continued to pay $1.8 million a year in carrying costs for two years after the passage of the Reform Act and then finally said, look, meanwhile, the redevelopment was going forward and the client said, look, if I can't use my property, why am I continuing to pay rent and carrying costs? Why didn't you insist that they take the property by condemnation and then litigate the value of the property? Because we think that the City of Dallas was correct, that the Reform Act prohibited our clients from continuing their business because, as I indicated, Section 5D talks about the removal of the Act. This is the one that talks about no Federal funds shall be used in removal of the gates at the Lemon Avenue facility as required by this Act. That's a Federal statute that says that. So to have litigated with the City of Dallas saying, oh, no, you actually don't have to remove those gates as Section 5D says and you actually don't have to proceed with the reduction to 20 gates as the statute says and, really, we can continue. This is an ongoing, viable, separate terminal that we can operate. I think that would have been a frivolous argument, quite frankly. So the trial court ... What exact language in the 2006 legislation do you rely on as incorporating the biparty agreement? Well, I hesitate to use the word incorporation. I don't think that's exactly the right term. That's the effect, however. Well, it's the effect. When Congress says you shall manage Lovefield in accordance with contractual obligations, quite frankly, and I think the court was asking about this, note that the sentence has two mandates. It says the city of Dallas shall allocate gates in accordance with the five-party agreement and shall manage Lovefield in compliance with the July 11th agreement. So those are two separate mandates. So it's not just about gate allocations. But the entirety of Section 5 is to utilize the local agreement, what Congress asked the local parties to come up with, and what they brought to Congress through the Senator Hutchison of Texas. And it's the way in which they would agree to the phasing out of the right amendment in return for limiting the number of flights that could go out of Lovefield. And the way that limitation took place was to limit the  of flights per day. That's a limitation on Lovefield. That would have been an antitrust violation, as the district court found. It certainly would not have been allowable under the Air Transportation Act, had Congress not authorized and required the right amendment in the 2006 legislation that that somehow constituted regulatory taking. Is that correct? Not entirely, Your Honor. You've sort of made two points. There are two expectations, I suppose, that we should talk about. The so-called reasonable expectations component of the Penn Central analysis is tested at the time of purchase. Suppose we were to reject the theory that you rely on and that the Court of Federal Claims adopted, that somehow it was reasonable for you to anticipate repeal of the right amendment and that somehow the 2006 legislation and continuing the right amendment was a take. Let's assume that we conclude that that is not a viable theory. If I may, Your Honor, that was not the theory I was going to expound, but rather I don't know, but listen to me. Assume that that theory, which is part of what the Court of Federal Claims said, is incorrect and that we disagree with the Court of Federal Claims with respect to that theory. What is left here? The Court of Federal Claims that the right amendment would be repealed. Right. Now we're going to damages. That's an entirely different issue. The taking, the reasonable expectations element of Penn Central is that you could conduct an air transportation business. Right amendment, no right amendment. That's what  That's the destroyed expectation. Valuation, then, looks at what did the market anticipate in 2006 at the time of the taking. And we were the only parties to present valuation testimony. We were the only party to present expert testimony on airport gate demand. And the court relied on that expert testimony and said based on Debra Meehan's expert report that the by mid 2005, the market anticipated that the right amendment would be repealed. In fact, American Airlines announced that they were going to repeal the right amendment. In mid May of 2006, the city of Dallas put out a study on what would be the impact of the repeal of the right amendment. And, of course, on October 13th, the reform act actually went into effect.  we have the largest airport in the world and no longer needs protection  smaller airport which is dominated by Southwest. Southwest has 97% of the flights out of that airport. Thank you, your honor. Three minutes of rebuttal. Thank you, your honor. I'll start with the last point here. Reasonable investment backed expectations. Their theory is that they had reasonable expectations to build the 16 gate terminal that could fly anywhere in the world. That was barred since 1980 by the right amendment. You cannot have a reasonable expectation that the right amendment was not going to be on the books. The reform act comes along and doesn't repeal it immediately. There can't be a reasonable expectation that federal law will be changed in a way that makes your investment on an airline terminal. Whose testimony was it that established that expectation you just described? I don't have the page. I think that was the case. The study postdates their complaint in this case and looked at what the value would be of a  fly anywhere terminal. There's nothing in the record that predates the reform act that shows that value. I also want to point out  it didn't happen before they made their investments. So suppose we were to agree with you that the notion that the right amendment would be repealed was not something that they could rely on. The 2006 act wasn't a change in the right amendment. What's left is their physical demolition argument. I think that's their reasonable investment expectation. I think the court should look at the other factors. Their investment had already failed. No airline had paid any rent for their terminal for five years before the reform act was passed. Turning back to 5B, it says no federal funds may be used to remove gates. That's a statement by Congress that we are not doing the removal. Don't use our money to do it. Don't bill us for it. If you want to do that, that's on you.  5B strongly supports the argument that there is no taking here. Finally... Did they present any testimony that if the right amendment continued, running the terminal for commercial aviation was a feasible   I don't recall any testimony on that. In any event, the federal government has said that they will continue to do  same thing. Their whole taking theory is based on a federal action that is just the reform act. Their theory is the reform act is what took their property. It loosened the restrictions. You could fly to more places and after eight years you could fly anywhere on any size plane. Unless the court has any further questions, we ask the CFC to enter judgment. Thank you. We thank both parties and the case is submitted.